Katie Marchant, OSB No. 161147
333 SW Taylor St., Suite 300
Portland, OR 97204
Email: katie@marchantlawllc.com
Phone: (615) 585-7603

Attorney for Surely Nalley Molina Escalante

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF OREGON**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **CASE NO. 3:24-cr-00426-AB-10** |
| **Plaintiff,** | |
| **vs.** | **DEFENDANT'S SENTENCING MEMORANDUM** |
| **Surely Nalley Molina Escalante,** | |
| **Defendant.** | |

The January 4, 2024, traffic stop that brings Surely Molina Escalante before the Court was her first contact with law enforcement and her last contact with the drug trade. After officers searched the car she was riding in, they seized 48.15 kilograms of methamphetamine, released her and arrested her eleven months later. In the interim, she ceased communication with the co-defendants in this case and did not engage in any further criminal activity. From a deterrence perspective, the stop did what it was supposed to do: it stopped further criminal activity.

In the 22 months since her arrest, Ms. Molina Escalante has demonstrated a remarkable commitment to her rehabilitative efforts. She did hit a setback in October 2024, when she was arrested for driving while intoxicated, after officers found her asleep in her car at a gas station.

This was an aberrant incident reflecting an acute level of stress. Her immediate acceptance of responsibility and recommitment to treatment programs put to bed any concerns of "crashing out." It should not overshadow nearly two years of hard work.

For the reasons explained below, it is the defense position that a sentence of time served followed by three years of supervised release is sufficient to satisfy the purposes of sentencing under 18 U.S.C. § 3553(a).[1] Ms. Molina Escalante has demonstrated that a prison sentence is unnecessary to deter her from engaging in further criminal conduct and she does not pose a risk of harm to the community. She also faces a unique constellation of collateral consequences stemming from dependency proceedings involving her two youngest children — for whom she is the sole provider. A prison sentence would result in an unusual and disproportionate impact on these children, one of whom is three years old and the other three months. The requested sentence would also avoid unwarranted disparities with Ms. Molina Escalante's similarly situated co-defendants.

## I. Case History

On November 13, 2024, a grand jury indicted Ms. Molina Escalante on one count of Conspiracy to Distribute Controlled Substances, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), and 846.[2] On December 9, 2024, law enforcement arrested her in Loma Linda,

---

[1] Ms. Molina Escalante spent approximately four days in custody following her December 9, 2024 arrest. PSR at 2. Although probation is precluded by 21 U.S.C. § 841(b)(1)(A), PSR ¶ 97, the Court may impose time served because she qualifies for safety-valve relief under 18 U.S.C. § 3553(f). PSR ¶¶ 44, 92.

[2] Ms. Molina Escalante was one of 13 defendants named in a 15-count indictment. Count One charged all the defendants with conspiracy to distribute a controlled substance. The remaining charges consist of offenses for distribution or possession-with-intent-to-distribute various controlled substances, including cocaine, fentanyl and methamphetamine. Ms. Molina Escalante was not charged in any of the substantive counts.

California.[3] On December 11, the Central District of California released her on conditions and ordered her to appear in this District on January 3, 2025, which she did. On November 13, 2025, Ms. Molina Escalante pleaded guilty to the conspiracy charge. She has been out of custody and living in San Bernardino County, California throughout the pendency of this case.

## II. California State Dependency Proceedings

Ms. Molina Escalante is currently a party to two dependency cases in the San Bernardino County Juvenile Court — one for her daughter Aliany and the other for her son Jaylian. As argued below, Ms. Molina Escalante's concerted efforts to meet the obligations imposed by the Juvenile Court, as well as the impact of a prison sentence on the proceedings' outcome, are relevant mitigating factors under 18 U.S.C. § 3553(a).

### A. Status of Aliany's dependency case

By way of background, law enforcement arrested Ms. Molina Escalante at Loma Linda University Health, while she was at a medical appointment related to Aliany's cerebral palsy. As Ms. Molina Escalante was Aliany's sole caretaker, a social worker from the San Bernardino County Children and Family Services ("CFS") took the child into emergency protective custody. On January 7, 2025, the Juvenile Court declared Aliany a dependent of the court and ordered her removal from Ms. Molina Escalante's physical custody. Aliany was initially placed in foster care until CFS approved placement with her paternal uncle. Ms. Molina Escalante has maintained her visitation rights throughout the proceeding. She has maintained consistent contact

[3] The PSR notes that she had $1,759.43 on her person at the time of the arrest. There is no allegation that this was criminal proceeds. Ms. Molina Escalante did not have a bank account and was paid by her then-employer (a fast food restaurant) in cash.

with her daughter and there is no indication that she is anything less than deeply bonded with her daughter.

On February 6, 2026, the court ordered “family reunification services,” which involve of a customized case plan that parents must complete in order to regain physical custody of their children. Ms. Molina Escalante’s case plan required, among other things, that she complete parenting classes and a substance abuse treatment program, that she participate in general counseling, undergo random drug testing and attend AA/NA meetings three times per week. By August, Ms. Molina Escalante had made meaningful progress toward completion of the case plan. She completed parenting classes and general counseling. All of her drug tests were negative. However she was struggling to find time for AA/NA meetings and a drug treatment program as she was working 60 hours per week in two jobs at the time.

On March 5, 2026, the court held a “12-Month Permanency Review Hearing” to determine whether Aliany could be returned to her mother. Unfortunately, Ms. Molina Escalante had not yet completed her case plan, so the court denied reunification as a matter of law. The court also found that there was no “substantial probability” that Aliany could be safely returned to Ms. Molina Escalante’s care within the next six months, given her pending criminal case and potential prison sentence. Accordingly, the court terminated reunification services (meaning the county would no longer coordinate and help subsidize the services needed to complete the case plan) and set a permanent placement hearing for January 8, 2027. At that hearing, the court will determine whether to terminate Ms. Molina Escalante’s parental rights to make way for an adoption.

However, there are still two avenues available to Ms. Molina Escalante to avoid losing her daughter. The first is a petition pursuant to California Welfare and Institutions Code (“WIC”)

§ 388 requesting a return of her daughter based on a formal change in circumstances. To prevail on such a petition, Ms. Molina Escalante must show that she completed her case treatment plan and that reunification is in Aliany's best interest – a showing she can make through continued regular visitation. In other words, if, before January 8, Ms. Molina Escalante (1) completes her drug treatment program, (2) attends the requisite number of AA/NA meetings, and (3) continues visiting her daughter as she always has —all of which she is on track to do — she has a viable argument for regaining custody of her daughter.

The alternative avenue is through the "beneficial parent-child relationship exception" at the January 8 hearing. The purpose of that hearing is to select and implement a permanent placement for Aliany, and, at that juncture, California's Welfare Code presumes that adoption is in the child's best interest. Ms. Molina Escalante can defeat that presumption, and avoid termination of her parental rights, if she can establish that the beneficial parent-child relationship exception applies. This, in turns, requires a showing that (1) that she regularly visits Aliany; (2) that the continuation of the mother-daughter relationship is in Aliany's best interest; and (3) that it would be harmful to the child to sever the relationship and chose adoption.

### B. Status of Jaylian's dependency case

Ms. Molina Escalante's son, Jaylian, was born on July 16, 2026. Four days later, CFS opened an investigation due to the pending federal case. On September 8, CFS filed its report with the juvenile court recommending that Jaylian stay with his mother. The report noted that although Ms. Molina Escalante is awaiting sentencing, she has arranged for her aunt to take custody of Jaylin if she is sentenced to prison. The court set a hearing for November 3, 2026, to finalize Jaylian's placement.

## III. Guidelines Calculation

The presentence report ("PSR") calculates a total offense level of 21 and a criminal history category of I, for an advisory range of 37 to 46 months. PSR ¶¶ 52, 56, 93, 112. Neither party objected to the calculation. The parties also agree with the PSR's application of the base offense level cap under USSG § 2D1.1(a)(5) and the four-level minimal participant reduction under § 3B1.2(a). PSR ¶¶ 43, 46; Gov't Sent. Mem. at 2. Ms. Molina Escalante served as a courier, which qualifies for the minimal role adjustment under the USSG § 2D1.1 amendments. *See United States v. Maciel*, 789 F. Supp. 3d 934, 939 (S.D. Cal. 2025) ("The purpose behind the amendment is for courts to more frequently apply adjustments under § 3B1.2(a) (minimal role) and grant defendants who are only couriers a 4-level reduction."). Indeed, her primary function was low even relative to other couriers. As Mr. Rovolorio Tambit, the driver, told police, Ms. Molina Escalante's job was simply "to accompany others who were transporting drugs because she was licensed to drive[.]" PSR ¶ 36. There is no evidence that Ms. Molina Escalante knew how much methamphetamine was in the trunk, that she owned any of it, or had any authority or control with respect to the operation. She was not even charged in the substantive count — Possession with Intent to Distribute Methamphetamine — related to her traffic stop. Only Mr. Rovolorio Tambit and Ms. Aguirre Gutierrez, who was supposed to receive the delivery in Oregon, were.[4]

## IV. The § 3553(a) factors support a sentence of time served and term of post-prison supervision

[4] The PSR suggests that Ms. Molina Escalante's name "may have been inadvertently omitted" from this count (i.e. Count 3). PSR ¶ 3n.1. As far as the defense is aware, there is no basis in the record for that speculation. It would be an unusual error. Given Ms. Molina Escalante's minimal role, it is plausible that the grand jury found insufficient evidence that she knew she was in possession of more than 500 grams of methamphetamine.

A sentence of time served and a term of post-prison supervision is sufficient to achieve the purposes of sentencing under 18 U.S.C. § 3553(a). *Gall v. United States*, 552 U.S. 38, 49 (2007) (explaining that the guidelines are "the starting point and the initial benchmark," but "not the only consideration."). Ms. Molina Escalante's history and characteristics warrant a variance from her guideline range, and her post-offense conduct shows that prison is unnecessary to deter her or protect the public. Moreover, the unusual set of collateral consequence she faces with respect to her children constitute sufficient punishment, and, in any event, a prison sentence would create unwarranted disparities among similarly situated co-defendants.

### A. Ms. Molina Escalante's History and Characteristics

#### 1. Childhood trauma does not excuse criminal conduct, but it can indicate a lower level of criminal orientation and corresponding higher capacity for rehabilitation

Ms. Molina Escalante's childhood, detailed in the PSR, was defined by violence and sexual abuse. PSR ¶¶ 64–67. She reported all ten categories of adverse childhood experiences ("ACEs"). *Id.* ¶ 80. The risk of serious, long-term harm "becomes very high once the individual has experienced four of these 10 categories." *United States v. Carter*, 506 F. Supp. 3d 1204, 1211 (M.D. Ala. 2020). "People who experience multiple categories of ACEs also are at higher risk of continued victimization in adulthood." *Id.* at 1209. Survivors of childhood abuse are more vulnerable to controlling partners, *see United States v. Brady*, 417 F.3d 326, 334–35 (2d Cir. 2005) (upholding finding that defendant's childhood abuse made her susceptible to the man who drew her into the offense), and women are frequently drawn into low-level trafficking through men involved in the drug trade.[5]

[5] Adam B. Weber, *The Courier Conundrum: The High Costs of Prosecuting Low-Level Drug Couriers and*

Ms. Molina Escalante's biography is tracks with this research. Having grown up witnessing her father physically abuse her mother, while enduring her own physical and sexual abuse, Ms. Molina Escalante fell prey to controlling male figures, one of whom (Aliany's father), exposed her the drug trade. PSR ¶ ¶ 68 (describing her ex-husband); 89 (describing Aliany's father). The behavior of such men does not, of course, absolve Ms. Molina Escalante of responsibility. Nor does it excuse what she did or diminish its seriousness. It does, however, provide context for her conduct. It evidences that her criminal behavior was situational rather than intrinsically criminal.[6] The reduced culpability, relative to defendants who have not undergone such abuse, justifies a variance under § 3553(a). *See United States v. Nesbeth*, 188 F. Supp. 3d 179, 180, 193-4 (E.D.N.Y. 2016) (probation, against a 33-to-41-month range, for courier who "apparently was under the influence of her boyfriend").

**2. Incarceration would cause a disproportionate hardship on Ms. Molina Escalante's two youngest children**

Ms. Molina Escalante is the only parent to Aliany (3) and Jaylian (3 months). Aliany was born premature and has cerebral palsy. PSR ¶ 70. She cannot walk or sit on her own. She requires a significant amount of medical attention in addition to ongoing physical therapy. *Id.* Her paternal uncle and his wife can no longer care for her, and if Ms. Molina Escalante is not able to reassert her custody and parenting rights, Aliany will likely wind up in foster care and Ms. Molina Escalante may lose her parenting rights. This would significantly complicate her

---

*What We Can Do About Them*, 87 Fordham L. Rev. 1749, 176-69 (2019) (collecting academic research on the point).

[6] *See* Jack B. Weinstein, *The Effect of Sentencing on Women, Men, the Family, and the Community*, 5 Colum. J. Gender & L. 169, 170 (1996) ("Many women who commit drug crimes do not act completely under their own volition, but rather out of fear of the dominant, abusive men in their lives.").

ability to deport with her daughter at the expiration of her sentence. As noted above, Ms. Molina Escalante has viable paths to reunification with her daughter. However, those paths are dependent upon Ms. Molina Escalante remaining out of custody. Since the juvenile court terminated reunification services, Ms. Molina Escalante has nonetheless worked to complete her case plan. She enrolled in a 16-session parenting program in May 2026. She completed substance abuse treatment and continues to test negative on every drug screen. *Id.* at 9. She is also attending multiple AA/NA sessions per week and maintains consistent contact with her daughter. According to Aliany's social worker, Ms. Molina Escaslante "rarely misses scheduled visits," is "actively engaged," and "provides care for [Aliany] without any reported concerns." *Id.*

A sentence of imprisonment would meaningfully disrupt Jaylian's life and his relationship with his mother. Although Ms. Molina Escalante was able to make arrangements for Jaylian in the event that she is incarcerated, the contingency plan does not ameliorate the harm that would be caused by separating a three-month old from his mother. It would also likely trigger removal proceedings in Jaylian's case as well at the November 3 hearing. The damage to children caused parental incarceration is well documented and courts have treated it as a relevant ground for imposing a non-guideline sentence *See United States v. Aguirre*, 214 F.3d 1122, 1127 (9th Cir. 2000) (affirming departure where defendant's young son had lost his father and "would be losing a mother for a substantial period of time").

**3. Ms. Molina Escalante's post-offense conduct, including her response to her DUI conviction, demonstrates her acceptance of responsibility and supports a substantial downward variance**

In *Pepper v. United States*, the Supreme Court confirmed that post-offense rehabilitation is a relevant mitigating circumstance that can support a downward variance, even to a non-prison sentence. 562 U.S. 476, 490–93 (2011). Although *Pepper* involved a resentencing after a

vacated sentence, its reasoning applies with at least equal force to Ms. Molina Escalante's first and only sentencing. As the Court in *Pepper* explained, evidence of rehabilitation "may be highly relevant to several of the § 3553(a) factors[.]" *Id.* at 491. It is "plainly relevant" to the defendant's history and characteristics. *Id.* at 492. It "sheds light on the likelihood that [the defendant] will engage in future criminal conduct," *Id.,* and it "may be taken as the most accurate indicator of [defendant's] present purposes and tendencies and significantly to suggest the period of restraint and the kind of discipline that ought to be imposed upon him." *Pepper*, 562 U.S. at 492 (citation omitted).

When Ms. Molina Escalante was arrested on charges of drunk driving, there was a concern that it foretold the beginning of a downward spiral. *See* Donald A. Dripps, *Fundamental Retribution Error: Criminal Justice and the Social Psychology of Blame*, 56 Vand. L. Rev. 1383, 1396 (2003) (describing the "fundamental attribution error" as the tendency to attribute conduct and its consequences to character rather than circumstances). However, it was an isolated incident, as the context in which it occurred and Ms. Molina Escalante's response to it shows.

In terms of context, the arrest occurred about one month before Ms. Molina Escalante was scheduled to plead guilty in this case. She was also staring down the barrel of prison, removal from the United States and permanent separation from her children. As she told the arresting officers, "It's going to be the last time I see my kids." PSR ¶ 55. But instead of escalating the self-destructive behavior, Ms. Molina Escalante sobered up and recommitted to her rehabilitation and sobriety. She accepted responsibility, entered a guilty plea before the first trial setting, and enrolled in the court-ordered nine-month alcohol program. She attends weekly treatment classes, goes to AA meetings twice a week and is continuing her mental health treatment.

Ms. Molina Escalante was sentenced to three years of probation for the DUI. The conviction altered Ms. Molina Escalante's guideline range because it made her ineligible for the two-point reduction for being a "zero-point" offender under §4C1.1. As a result, it increased her guideline range from 30-37 months to 37-46 months. In response, probation increased its recommended sentence by 50 percent: from 12 to 18 months. In doing so, it appears that the PSR simply followed the guideline increase, without making an individualized assessment of how the conviction impacted the 3553(a) factors. The defense believes that a variance is warranted to offset the outsized impact of the DUI conviction's on probation's recommended sentence. Six months is the maximum jail term that the state could have imposed for Ms. Molina Escalante's first-time DUI offense. *See* Cal. Veh. Code § 23536(a) (imposing a maximum sentence of 6 months jail time but mandating that the defendant "be imprisoned on days other than days of regular employment"). Yet the nature and circumstances of her conduct do not align with the most egregious conduct captured by the DUI statute. She did not, for example, cause any property damage or injury to anyone else. There was no one else in the car with her, and no witnesses reported her driving recklessly or otherwise endangering others. The state court determined that what she did warranted a sentence of three years' probation. To add six months imprisonment on top of that is more than what is required to achieve the aims of sentencing.

**4. Ms. Molina Escalante's pretrial release record evidences a concerted commitment to sobriety and mental health treatment – both of which provide strong protections against recidivism.**

Ms. Molina Escalante has shown remarkable accountability and follow-through in this case. Following her arrest, the Central District of California ordered her to appear in this District on January 3, 2025. The Central District, however, did not notify Pretrial Services that she was coming, so there was no record of where or when she was to appear. When Ms. Molina Escalante

arrived, the magistrate judge noted on the record that, had she not appeared, "the Court would not have been the wiser." For someone facing a ten-year mandatory minimum sentence and near-certain deportation, that is no small thing.

During her time on pretrial release, Ms. Molina Escalante has maintained steady employment and worked hard to meet a significant number of obligations imposed by three different courts, which have included the following:

- Between the date of her arrest and March 2026, Ms. Molina Escalante called in to two separate drug-testing facilities every day to see if she had to go in for random drug testing. She typically submitted to 2-4 random tests per month. All of her tests came back negative, so both pretrial services and the juvenile court eventually allowed her to report less often.
- She completed general counseling as required by her dependency case.
- She attends mental health treatment twice a week to comply with her federal pretrial release conditions and the case plan in her dependency proceeding.
- She attends AA/NA meetings approximately twice per week.
- She attends a weekly drug and alcohol treatment program that is part of her probation conditions in her DUI case.
- She completed the outpatient substance abuse program required in her daughter's dependency proceeding. Initially, the program met twice per week for two hours each time. Following her successful completion, she now attends weekly maintenance group sessions.
- She completed the parenting classes required in both dependency cases.
- She visits her daughter every week for the maximum amount of time allowed by the juvenile court.
- She meets regularly with her CFS caseworkers as required by the case plan.

The PSR reports that Ms. Molina Escalante missed approximately seven drug tests and 13 counseling sessions. PSR ¶ 23. But put in the above context, these represent a small fraction of the drug tests she completed and counseling sessions she attended over nearly a two-year period.

Measured against all that is asked of her, that is a record of hard work and substantial compliance.

### A. Sentence of Time Served Satisfies the Need for the Sentence Imposed to Provide Just Punishment, Afford Adequate Deterrence, Protect the Public, and Provide Needed Treatment in the Most Effective Manner (§ 3553(a)(2))

Ms. Molina Escalante pleaded guilty to a serious offense, and she was convicted of DUI while her sentencing was pleading. In light of the collateral consequences of her conviction, a sentence of time served followed by a term of supervised release with onerous conditions reflects the seriousness of her conduct and provides just punishment for the offenses. *United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) ("It is difficult to see how a court can properly calibrate a 'just punishment' if it does not consider the collateral effects of a particular sentence."

Ms. Molina Escalante's plea agreement acknowledges that her conviction in this case makes her removal virtually certain. PSR ¶ 6 n.2. And given the nature of the crime to which she pleaded guilty, that removal will, in all likelihood, be permanent and reentry will not be allowed. *See* 8 U.S.C. § 1101(a)(43)(B) (a conviction for conspiracy to distribute a controlled substance is "illicit trafficking in a controlled substance," an aggravated felony); 8 U.S.C. § 1182(a)(2)(A)(i)(II) (barring admission of any noncitizen convicted of a controlled substance offense); *United States v. Gonzalez-Corn*, 807 F.3d 989 (9th Cir. 2015) (holding that a a federal conviction for a Controlled Substances Act drug-trafficking felony is, by definition, an aggravated felony under the INA).

This is of no minor consequence. Courts recognize that deportation is a "particularly severe 'penalty,'" and "an integral part—indeed, sometimes the most important part—of the penalty that may be imposed on noncitizen defendants who plead guilty." *Padilla v. Kentucky*, 559 U.S. 356, 364–65 (2010). Regardless of whether a custodial sentence is imposed, Ms.

Molina Escalante faces the near-certain loss of her lawful status and removal from the only country she has known since she was 14. PSR ¶¶ 6, 74. She is culturally assimilated and her children are U.S. citizens. Ms. Molina Escalante came to the United States when she was 14 and has lived here for more than two decades. The separation from her children alone is a severe punishment beyond any term of imprisonment or supervision ordered.

Her immigration status would also make any prison term harsher than the same term for a citizen. The Bureau of Prisons assigns deportable noncitizens a "public safety factor" that bars placement in a minimum-security camp. *See* Fed. Bureau of Prisons, Program Statement P5100.08, *Inmate Security Designation and Custody Classification*, ch. 5 (2006). Noncitizens with detainers generally cannot finish their sentences in a halfway house or home confinement. *See* 18 U.S.C. § 3624(c). Those harsher conditions may justify a lesser sentence. *See United States v. Charry Cubillos*, 91 F.3d 1342, 1344 (9th Cir. 1996); *United States v. Smith*, 27 F.3d 649, 655 (D.C. Cir. 1994); *United States v. Pacheco-Soto*, 386 F. Supp. 2d 1198, 1205 (D.N.M. 2005) (below-guideline sentence where deportable defendant would be ineligible for early release, minimum-security placement and drug-program credits).

Prison is unnecessary to deter Ms. Molina Escalante or protect the public. Before this case, she had never been arrested. Her only criminal history point is the misdemeanor DUI. PSR ¶¶ 55–56. More telling than any statistical prediction is her record. After nearly two years of supervision, random testing and home visits, she has had no drug use, no new drug-related conduct, and maintained steady employment. *Id.* 21–23, 73. General deterrence does not call for prison either. It is the certainty of being caught, not the severity of punishment, that deters crime, as Ms. Molina Escalante herself demonstrated. *See* Nat'l Inst. of Just., U.S. Dep't of Just., *Five Things About Deterrence* (2016) ("The certainty of being caught is a vastly more powerful

deterrent than the punishment."); Weber, *supra*, at 1780 (harsh penalties for low-level couriers are "unlikely to have a measurable impact on drug-trafficking crimes").

Finally, time served lets Ms. Molina Escalante continue treatment "in the most effective manner." 18 U.S.C. § 3553(a)(2)(D). Congress has recognized that "imprisonment is not an appropriate means of promoting correction and rehabilitation." 18 U.S.C. § 3582(a); *see Tapia v. United States*, 564 U.S. 319, 327–28 (2011). Ms. Molina Escalante has been in substance use and mental health counseling for more than a year and is completing a state-ordered alcohol program. Given her history, she needs continued trauma-informed care, and it is best provided in the community under supervision. *See United States v. Autery*, 555 F.3d 864, 877 (9th Cir. 2009) (affirming variance to probation based in part on finding that incarceration would undermine rehabilitation).

## V. Avoiding unwarranted sentencing disparities

A sentence of time served, and three years of post-prison supervision would avoid unwarranted disparities among co-defendants in this case. It is in line with the sentences imposed on similarly situated co-defendants Rodolfo Garcia and Brandy Ortiz. *United States v. Garcia*, No. 3:24-cr-00426-AB-5 (ECF No. 232); *United States v. Ortiz*, No. 3:24-cr-00426-AB-13 (ECF No. 291). It is also in line with the sentence imposed in *United States v. Aguirre Gutierrez*, No. 3:24-cr-00426-AB-3 (ECF No. 209). Like Ms. Molina Escalante, Ms. Aguirre Gutierrez acted as a courier, but she operated on a meaningfully lager scale than Ms. Molina Escalante. *Id* (Gov't Sent. Mem. at 2, ECF No. 192). Ms. Molina Escalante is the least-charged defendant in the indictment. Sentencing her to 18 or 30 months, after imposing time served on co-defendants with more serious conduct, would create risks creating the disparity that § 3553(a)(6) forbids.

## VI. VII. Conclusion

For the reasons set forth above, Ms. Molina Escalante respectfully asks the Court to impose a sentence of time served, followed by three years of supervised release, with the special conditions Probation recommends.

//

Respectfully submitted on October 27, 2026.

*/s Katie Marchant*
Katie Marchant, OSB 161147
Attorney for Defendant